

_____ FILED          _____ RECEIVED
_____ ENTERED        _____ SERVED ON
                 COUNSEL/PARTIES OF RECORD

AUG 3 0 2017

US DISTRICT COURT
DISTRICT OF NEVADA
_____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DONALD DELONEY

    Petitioner

v.

WARDEN LeGRAND, et al.,

    Respondents

3:14-cv-00459-RCJ-WGC

**ORDER**

    Petitioner Donald Deloney, a prisoner in the custody of the State of Nevada, brings this habeas action under 28 U.S.C. § 2254 to challenge his 2008 Nevada state conviction for first-degree murder with the use of a deadly weapon. After evaluating his claims on the merits, this Court denies Deloney's petition for a writ of habeas corpus, dismisses this action with prejudice, and denies a certificate of appealability.

**I. BACKGROUND**

    For the shooting of David Johnson during the early morning hours of July 25, 2006, the petitioner, Donald Deloney, was convicted of first-degree murder with the use of a deadly weapon following a three-day jury trial. (Exhibits 22–24).[1] The trial court sentenced him to two consecutive terms of imprisonment of twenty years to life, in addition to various monetary sums. (Exhibits 37–38).

    Deloney appealed, and the Nevada Supreme Court affirmed on November 30, 2009, with

---

[1] The exhibits referenced in this order are found in the Court's record at ECF Nos. 10–15 (Exhibits 1–107). All page citations are to the page numbers of the documents themselves, rather than the ECF-generated page numbers, except as indicated.

1

| | |
|---|---|
| 1 | remittitur issuing on December 29, 2009. (Exhibits 39, 48, 49). He filed a habeas petition in state |
| 2 | court on July 14, 2010, and the state district court ordered an evidentiary hearing on June 22, 2011. |
| 3 | (Exhibits 50, 56, 62). Deloney filed a supplemental petition on April 4, 2012. (Exhibit 72). The |
| 4 | evidentiary hearing occurred on August 17 and August 28, 2012. (Exhibits 75–76). The state district |
| 5 | court denied the petition on January 10, 2013. (Exhibit 78). He appealed, and the Nevada Supreme |
| 6 | Court affirmed on May 13, 2014. (Exhibits 85, 101). Deloney petitioned for hearing, the petition |
| 7 | was denied, and remittitur issued on August 26, 2014. (Exhibits 102–03). |
| 8 |       Deloney filed an Amended Petition for a Writ of Habeas Corpus in federal court on April 10, |
| 9 | 2015. (ECF No. 9). The State filed an Answer. (ECF No. 17). Deloney filed a Reply. (ECF No. 21). |
| 10 | **II. FEDERAL HABEAS REVIEW STANDARDS** |
| 11 |       When a state court has adjudicated a claim on the merits, the Antiterrorism and Effective |
| 12 | Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court |
| 13 | ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit |
| 14 | of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of |
| 15 | review, a federal court may not grant habeas relief merely because it might conclude that the state |
| 16 | court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant |
| 17 | relief only if the state court decision: (1) was either contrary to or involved an unreasonable |
| 18 | application of clearly established law as determined by the United States Supreme Court or (2) was |
| 19 | based on an unreasonable determination of the facts in light of the evidence presented at the state |
| 20 | court proceeding. *Id.* at 181–88. The petitioner bears the burden of proof. *Id.* at 181. |
| 21 |       A state court decision is "contrary to" law clearly established by the Supreme Court only if it |
| 22 | applies a rule that contradicts the governing law set forth in Supreme Court case law or if the |
| 23 | decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision |
| 24 | and nevertheless arrives at a different result. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 15–16 |
| 25 | (2003). A state court decision is not contrary to established federal law merely because it does not |
| 26 | cite the Supreme Court's opinions. *Id.* The Supreme Court has held that a state court need not even |
| 27 | be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts |
| 28 | 2 |

them. *Id.* And "a federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. A decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *See, e.g., id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). When a state court's factual findings based on the record before it are challenged, the "unreasonable determination of fact" clause of 28 U.S.C. § 2254(d)(2) controls, which requires federal courts to be "particularly deferential" to state court factual determinations. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court's factual findings are presumed to be correct and the petitioner must rebut that presumption by "clear and convincing evidence." In this inquiry, federal courts may not look to any factual basis not developed before the state court unless the petitioner both shows that the claim relies on either (a) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (b) "a factual predicate that could not have been previously discovered through the exercise of due diligence" and shows that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

When a state court summarily rejects a claim, it is the petitioner's burden to show that "there

3

was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

## III. ANALYSIS

### A.     Ground 1

In Ground 1, Deloney argues that "[t]here was insufficient evidence to sustain a conviction of First Degree Murder." (ECF No. 9, at 10). This argument hinges on *Jackson v. Virginia*, 443 U.S. 307 (1979), where the Supreme Court held that a conviction comports with due process only if, viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found essential elements of the crime beyond a reasonable doubt." *Id.* at 319. The Nevada Supreme Court cited this standard and held that Deloney did not meet it. (*See* Exhibit 47, at 2–3).

Therefore, on federal habeas review, this Court combines the deferential standards of *Jackson* with the deferential standards of AEDPA to approach the claim that the Nevada Supreme Court got it wrong with a "double layer of deference." *Smith v. Mitchell*, 624 F.3d 1235, 1239 (9th Cir. 2010). Deloney "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

To convict a defendant for first-degree murder, the State must show that the defendant committed a "willful, deliberate and premeditated killing" with "malice aforethought, either express or implied." *See* Nev. Rev. Stat. §§ 200.010(1); 200.030(1)(a). "Willful" means a "specific . . . intent to [commit] an act forbidden by law." *United States v. Drew*, 722 F.2d 551, 553 (9th Cir. 1983). "Premeditation" is a determination to kill "formed in the mind by the time of the killing," which can be instantaneous with the act following immediately after the thoughts are formed. *Buford v. State*, 994 P.2d 700, 714 (Nev. 2000). "Malice" is implied "when no considerable provocation appears." Nev. Rev. Stat. § 200.020(2).

A rational factfinder could have found Deloney guilty of first-degree murder. James Marcel Purifoy ("Cel") testified that he was good friends—to the point where he called him his cousin—with Deloney and that on July 25, 2006, the day of the shooting, Cel, along with his father,

James Purifoy, Jr. ("Mojo"), picked up Deloney; later, Johnson, the victim, flagged down the car in an attempt to purchase cocaine at around 5:00 am. (Exhibit 23, at 115–20). Cel got out of the car to sell Johnson cocaine, but Johnson did not have money and tried to get the cocaine for free. (*Id.*, at 123). Cel then turned around and muttered, "Man, he's tripping." (*Id.*). In fact, Johnson had pulled this type of stunt with Cel before. (*See id.*, at 130–31). When Cel was about to get back into the car, he saw Deloney "hop[] out of the car" and shoot Johnson. (*Id.*, at 123–24). Cel got back into the car, as did Deloney, and they drove away with Deloney "[t]rying to convince [Cel] why he did it." (*Id.*, at 125). Mojo testified to the same. (*See id.*, at 223–39). Deloney's then-girlfriend also testified that Cel was "believed to be a cousin or called a cousin of Mr. Deloney." (Exhibit 24, at 56).

Shylee McNair, a friend of Cel's and an acquaintance of Deloney's, testified that later that day, Cel and Deloney came over to her house and she could "tell by the way that they were acting that something had happened." (Exhibit 23, at 186; *see also id.*, at 198). She overheard Cel telling Deloney that he was "stupid," and noticed that Deloney was acting very "hyphy," or hyperactive. (*Id.*, at 187–88). In fact, Deloney was "jumping around the room going, pow, pow, pow" and referred to a third person as a "mother****er." (*Id.*, at 190–92). Deloney also said that "he shouldn't have said what he'd said or shouldn't have done what he'd done." (*Id.*, at 192–93). Cel then told Deloney to "just shut up." (*Id.*, at 193). She also testified that, back then, Deloney had longer hair than he did at the trial—either in braids or an afro. (*See id.*, at 199). When Deloney came back later that day, McNair testified that he had gotten a haircut and his hair was shorter than it was that morning. (*See id.*, at 200–01). Deloney mentioned to her that, while he was napping that afternoon, he had "bad dreams" about "[t]hat man's face." (*Id.*, at 204). While Deloney was watching the news coverage of the shooting, he "said, like a question I popped off nine, or, I didn't know I popped off nine." (*Id.*, at 203). She then kicked him out of her house. (*See id.*, at 203–04).

Priscilla Chopper, a resident of the area, testified that she was having a cigarette in her car when she saw Deloney shoot Johnson from roughly 300 feet away. (Exhibit 24, at 51, 58, 61–70). Before identifying Deloney, she described the shooter as a tall African American man, "not real big but tall" with an afro. (*See* Exhibit 31, at 27).

5

Ken Roberts, a friend of Cel's from jail, testified that Deloney admitted to Roberts that Deloney was the shooter. (*See id.*, at 108–13). Even though Roberts was in jail pending charges, he testified that he made no deal with the State in exchange for his testimony. (*See id.* at 114–15).

The State also called Alice Cooper, Deloney's girlfriend at the time of the shooting. (*See id.*, at 56). The parties stipulated, in front of the jury, that, "in a previous hearing in this matter with under oath . . . [Deloney] testified that . . . he was sleeping at his girlfriend, Alice Cooper's, residence" at the time of the shooting. (*Id.*, at 37–38). Cooper testified that she did not know where he was between the time they went to bed around midnight and she woke up alone to him coming into her bedroom wearing a white t-shirt, at some time in the morning when it was still light outside probably between six and seven. (*Id.*, at 40–41, 50–51, 59–62). She testified that he looked some something akin to "all shook up" and "nervous." (*Id.*, at 60–61). During a May 2008 police interview, she said that he received a phone call from his cousin Cel "telling him to come meet him somewhere or something . . . at 1:00 or 2:00 in the morning." (*Id.*, at 58; *see also id.*, at 87). She now claims that "that's not true" as to the timing, that it was before she went to bed, probably "12:00 something," and that he did not go meet his cousin. (*Id.*, at 58–59). However, the State impeached her with the fact that, during that same police interview, she said that he "admitted to [her] that he was in the car with Sell [sic] that night." (*Id.*, at 64). Thus, she admitted that Deloney "must have got up and left from [her] apartment that night." (*Id.*, at 65–66). Moreover, in a phone call between Deloney and Cooper, Deloney told her that the phone call from Cel occurred at "4:00 or something like that." (*Id.*, at 88–89). When asked if Deloney had asked her to "make up an alibi" for him by getting a statement from the neighbors that he was upstairs in the apartment, Cooper responded that "[i]t was not to make up an alibi" because "[t]here was no make up. It was the truth." (*Id.*, at 51, 54). The State impeached her with the transcript of the May 2008 police interview in which she was asked, "Did he tell you . . . to try to find neighbors to—to make up an alibi?" and she responded "Yes." (*Id.*, at 55; *see also id.*, at 42). Cooper later admitted that Deloney had asked her to make a statement that she was with him as an alibi. (*Id.*, at 72–73). Earlier, the State had partially impeached her testimony that Deloney told her that he was going to California to see relatives after

6

the shooting with the fact that when, in the same police interview, she was asked if Deloney had said anything about Deloney "going to California because his relatives were ill or something like that," she laughed—seemingly saying no. (*See id.*, at 41–42, 45, 48–49). So when asked if she was correcting her testimony, she responded "I'm correcting my testimony, correct." (*Id.*, at 45–46). She also remembered telling the police that Deloney "got the [heck] out of Reno because somebody was telling on him"—specifically that "Sell [sic] . . . said that [Deloney] told police that [Deloney] was the shooter, and they were looking for [Deloney]." (*Id.*, at 47–49). When they spoke on the phone later, Cooper told Deloney that he was wanted for the murder in Reno, and he replied "I'm not coming back to Reno." (*Id.*, at 84). Cooper had said during the 2008 police interview, "I ain't no snitch," and agreed with that sentiment regarding her testifying that day in court. (*Id.*, at 66). She also had a felony conviction for fraud. (*Id.*).

Deloney's core defense strategy was to argue that Cel was the shooter, and that he was motivated to kill Johnson due to Johnson's failure to pay Cel drug money based on the history between Cel and Johnson. (*See* Exhibit 31, at 61–63). In furtherance of that strategy, Deloney's counsel called one witness, Claude Norris, whom Deloney argues creates doubt as to whether the person in the passenger seat was even Deloney. (*Id.*, at 117). Norris testified that he lived in a second-floor apartment that overlooked where the shooting happened. (*See id.*, at 118). After he heard three or four gunshots, he "ducked for cover," protected his wife, and then "ripped the curtain open to see what [he] could see." (*Id.*, at 119, 125–26). He saw a car, for about a second, with a "big Samoan guy . . . sitting in the window"—he saw "great big arms" and hair that "looked like an afro, but not like an afro" and so he assumed he was Samoan. (*Id.*, at 120, 123). On cross-examination, the State pointed out that Norris estimated that the victim, whom he'd seen for roughly the same amount of time, was probably American Indian, 135 pounds, and 5'5" but that he was actually African American, 231 pounds, and 5'11". (*Id.*, at 131). Norris also admitted that the arm that he thought belonged to the passenger could have belonged to the driver. (*See id.*, at 133).

During the defense's cross-examination of various witnesses, she elicited that, in August 2006, Cel got arrested selling drugs. From jail, Cel placed a call to his girlfriend telling her to "wipe

it down, wipe it clean, get rid of it." (Exhibit 31 at 63). Cel testified that he was telling her to "wipe out everything in the bag" that he used to keep his other drugs—which at that time included several ounces of cocaine that he had packed into baggies and a scale. (Exhibit 23, at 140–41). Deloney's counsel tried to argue that it was the gun, not drugs and a scale, in the bag. (Exhibit 31, at 63; *see* ECF No. 21, at 8). Furthermore, Cel received a suspended sentence in exchange for testifying against Deloney on a charge that carried up to a six-year sentence. (Exhibit 23, at 62).

Deloney argues that "there is a complete lack of evidence as to any reason that Deloney would shoot Johnson," or that he had ever met Johnson, which goes against "finding that premeditation existed." (ECF No. 9 at 11). That might well be true, and it is a consideration for the jury, but it is not preclusive of a finding of premeditation.

Deloney's next argument is that "the only evidence that could possibly support an inference that the murder was planned was Cel's self-serving testimony and Mojo's biased testimony that Deloney had a gun." (ECF No. 9 at 12). Similarly, Roberts's testimony that Deloney admitted to being the shooter comes from someone who is good friends with Cel. Deloney admits that this case was simply "a credibility contest." (ECF No. 9 at 14). Deloney points to the fact that Cel might have just been trying to cover-up the fact that he committed the murder and that Mojo wanted to support Cel's testimony because he was his son—and that both of them were felons. Moreover, Deloney points out that Chopper's identification was weakened, for the reasons discussed below in Ground 2. However, combined with the testimony about Deloney's behavior around the time of the killings from McNair and Cooper alongside Chopper's identification of Deloney, a rational jury could have overlooked the biases and ulterior motives that Deloney points out in Cel's, Mojo's, and Roberts's testimony. (*See* Exhibit 24, at 38–41, 50–64, 73–75).

Deloney also points out that Norris thought that he saw a "big Samoan man" with an "afro" in the passenger seat. (ECF No. 21 at 15). Deloney admits that he is 6'1" and 170 pounds, but argues that he is not Samoan and that he wore his hair in braids not as an afro. (*Id.*). Norris's ability to identify people's size and ethnicity was substantially called into doubt by his misidentification of the victim's size and ethnicity and his basis for his determination about the passenger's race—his

"afro"-like haircut. (*See* Exhibit 24, at 131). Moreover, Cooper testified that Deloney's hair could have been as an afro—he kept it either in braids or as an afro. (*See* Exhibit 23, at 199). Lastly, Norris did not see who actually did the shooting, but rather only one arm—and admitted that the arm could have actually been the driver's. In other words, Norris's testimony might have been damaging than helpful to Deloney.

The Nevada Supreme Court acknowledged that the State did not find DNA, fingerprints, or the murder weapon. (Exhibit 47 at 3). Nonetheless, it held that the testimony of Mojo and Cel; the eyewitness account from Chopper; a confession from Deloney to Roberts; testimony from McNair who observed Deloney after the death; and testimony from Cooper, Deloney's ex-girlfriend, that she could not account for his whereabouts at the time of the murder sufficed for a rational trier of fact to find him guilty of first-degree murder. (*Id.*). This evidence, as described in detail above, passes this Court's doubly deferential review of establishing the elements of first-degree murder with the use of a deadly weapon.

Ground 1 provides no basis for habeas relief.

**B.      Ground 2**

Deloney raises two claims of ineffective assistance of trial counsel. To succeed on an ineffective assistance of counsel claim, a defendant must show that counsel's representation fell below an objective standard of reasonableness and a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Courts evaluate a counsel's performance from counsel's perspective at the time and begin with a strong presumption that counsel's conduct well within the wide range of reasonable conduct. *See, e.g.*, *Beardslee v. Woodford*, 358 F.3d 560, 569 (9th Cir. 2004). When a state court has reviewed a *Strickland* claim, a federal court's habeas review is "doubly deferential"—the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d). *Pinholster*, 563 U.S. at 190, 202.

### 1. Failing to call an expert on eyewitness testimony

Deloney first argues that counsel was ineffective for failing to call an expert to discuss the problems with eyewitness testimony, such as that provided by Chopper against him. The Nevada Supreme Court held that Deloney failed to establish prejudice. (Exhibit 101, at 7). Indeed, courts have rejected the argument that a failure to call an expert to opine on the deficiencies of eyewitness testimony amounts to ineffective assistance of counsel. The Ninth Circuit has repeatedly "adhere[d] to the position that skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable." *Howard v. Clark*, 608 F.3d 563, 574 (9th Cir. 2010) (citation omitted); *see also Jones v. Smith*, 772 F.2d 668, 673 (11th Cir. 1985) ("The likelihood of mistaken identification by Banks was brought to the jury's full attention through cross-examination."). "If federal defendants are not prejudiced by the exclusion of testimony from eyewitness-identification experts, [Deloney] was not prejudiced by his trial attorney's failure to call such an expert . . . ." *Howard*, 608 F.3d at 574; *see also Rose v. Evans*, 414 Fed. App'x 1, 4 (9th Cir. 2011) ("[W]e previously have held that, because our precedent establishes that expert testimony on the unreliability of eyewitness testimony may be excluded without prejudice to defendants, it was also not prejudicial for defense counsel to fail to call such a witness.").

Moreover, just as in *Howard*, trial counsel cross-examined Chopper and hit on significant points about eyewitness reliability, particularly with regard to Chopper's mental state. Counsel discussed the multiple medications that Chopper was taking for several different reasons along with their potential side effects and how she had been diagnosed with paranoid schizophrenia, depression, and post-traumatic stress disorder. (*See* Exhibit 22, at 73–75, 78). Counsel also did a practical demonstration in the courtroom of how far away she was from the scene and how, when asked about the lighting, she had said at an earlier time that she "could not see very well, it was so far away" and that she was "hysterical" when she witnessed the shooting. (*Id.*, at 75–76; *see also* Exhibit 23, at 10–12). Counsel pointed out that the courtroom was about one-fourth as long as the distance that she saw the shooting, and she admitted having trouble seeing across the courtroom. Counsel further

pointed out discrepancies with regards to the car's color. (*See* Exhibit 23, at 6–8). And on re-cross-examination, counsel discussed how the first time that Chopper identified Deloney in person, Deloney was sitting at a table, probably in handcuffs, alongside a female and his Caucasian lawyer. (*See id.*, at 35). During closing argument, counsel reiterated these points. (*See* Exhibit 31, at 59–60).

The testimony that Deloney contends that his counsel would have elicited from an expert, as demonstrated at the evidentiary hearing, is not significantly different from the above testimony when combined with common sense and rational inferences, as discussed in *Howard*. (*See* Exhibit 75). First, the expert would have pointed to the fact that first in-person identification, just as counsel did on re-cross. (*See* ECF No. 9 at 17). Second, the expert would have "informed jurors that research indicates that once a witness is more than 140 feet away," there's not much detail for an identification. (*Id.*). As discussed above, counsel hammered home the lengths—and Chopper's own statement that she could not see very well—and a jury can make that leap itself. The expert "also would have informed the jurors that how well lit the environment is also plays a role in one's ability to see detail from a distance." (*Id.*, at 17–18). The jury, again, did not need an expert's assistance on this score. Deloney points to the expert's testimony about the length of time between the shooting and the identification and the mental health issues that Chopper was undergoing—but Deloney's counsel did the same. Deloney finally points to the fact that an expert could talk about how "Chopper's identification of Deloney to police is problematic because it lacks detail and is different than how others described what the shooter looked like." (*Id.*, at 18). Such things are easily covered—and were—without the aid of an expert. Therefore, to the extent that failing to call an expert was even deficient, Deloney has failed to establish prejudice on doubly deferential review.

The Nevada Supreme Court's determination that Deloney failed to demonstrate prejudice from counsel's failure to call an eyewitness expert is in accordance with Ninth Circuit precedent and not an unreasonable application of clearly established U.S. Supreme Court law.

Ground 2-1 provides no basis for habeas relief.

**2.      Failing to present evidence of the shooter wearing a green shirt**

Deloney finally argues that trial counsel was ineffective for "failing to present evidence that

1  Cel was the shooter,' and the evidence regarding 'the guy in the green shirt shot me.'" (ECF No. 9, at

2  18; *see also* Exhibit 75, at 26, 32). The Nevada Supreme Court first denied the claim because

3  Deloney "failed to provide this court with . . . police reports that allegedly indicate the shooter was

4  wearing green." (Exhibit 101, at 3). Deloney filed a petition for rehearing. (Exhibit 102, at 2). The

5  Nevada Supreme Court summarily denied rehearing. (Exhibit 103). Therefore, it is Deloney's

6  burden to show that there exists "no reasonable basis" for the state court to have denied relief.

7  *Richter*, 562 U.S. at 98.

8      In Deloney's appeal to the Nevada Supreme Court, he provided only the transcripts of the

9  evidentiary hearing. (*See* Exhibit 86, at 5, 7 (ECF-generated page numbers) (tables of contents for

10 the appendices)). After the Nevada Supreme Court affirmed Deloney's sentence, he petitioned for

11 rehearing and provided the police reports. (*See* Exhibit 102, at 28–37). In his federal Reply, Deloney

12 attempts to characterize the "transcripts of the previous proceedings" that the Nevada Supreme Court

13 claimed not to receive as the transcript of the evidentiary hearing, and then paint that claim out as

14 patently false. (ECF No. 21, at 19–20; *see also id.*, at 20 ("However, the Nevada Supreme Court's

15 finding is nonsensical due to the fact that it was given that which it said it did not have, and was

16 actually in possession of the evidentiary hearing transcripts on appeal.")). This is not an accurate

17 characterization of the Nevada Supreme Court's affirmance. Instead, the proceedings that it was

18 referring to are *different* proceedings, and those different proceedings were not in the record before

19 it. The whole paragraph reads as follows:

20          Fourth, appellant argues that counsel was ineffective for (1) failing to realize
           and then argue that P. Chopper's testimony about the shooter's actions matched the
21          driver's description of his own actions <u>as testified to in previous proceedings</u> and
           (2) not presenting evidence <u>that the shooter wore green</u> where witnesses said
22          appellant was in white. Appellant has failed to demonstrate deficiency or prejudice.
           Appellant has failed to provide this court with <u>transcripts of the previous proceedings</u>
23          or <u>with police reports that allegedly indicate the shooter was wearing green</u>, thereby
           precluding review of the district court's disposition of these claims. We therefore
24          conclude that the district court did not err in denying these claims.

25 (Exhibit 101, at 3 (emphasis added) (citation omitted)). The more fair reading, and indeed courts

26 look for any reasonable one, is that the Nevada Supreme Court faulted claim (1) for not having the

27 transcripts of the proceeding and claim (2) for not providing the police reports. Therefore, Deloney's

28                                            12

contention that the Nevada Supreme Court erroneously overlooked parts of the record fails.

And federal courts on habeas are restricted viewing "evidence presented in the State court proceeding" unless the new evidence "could not have been previously discovered through the exercise of diligence" and the facts "establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(d)(2), (e)(2)(A)(ii). Due diligence could have provided the Nevada Supreme Court with the police reports that Deloney's claim rely on. Looking at only the transcript of the proceeding, the Nevada Supreme Court's determination that Deloney only providing offhand references to one small portion of what the police reports might have said from during the evidentiary hearing was inadequate to carry his burden of demonstrating a reasonable probability of a different outcome had trial counsel investigated did not involve an unreasonable determination of fact nor was it contrary to, or an unreasonable application of, clearly established U.S. Supreme Court law.

Ground 2-2 provides no basis for habeas relief.

## C. Ground 3

Deloney last claims that he is "entitled to relief because the cumulative effect of the errors raised on direct appeal, in state habeas proceedings, and in this petition, violate his right to due process as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution." (ECF No. 9, at 19).

> [T]he Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. . . . [T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense "far less persuasive" and thereby had a "substantial and injurious effect or influence" on the jury's verdict.

*Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citations omitted). The majority of the errors identified by Deloney are not errors, and the ones that could fairly be construed as errors did not combine to have a substantial and injurious effect or influence on the jury's verdict.

Ground 3 provides no basis for habeas relief.

13

**IV. CONCLUSION**

Accordingly, IT IS HEREBY ORDERED that **Deloney's petition for a writ of habeas corpus is DENIED** on the merits, and this action is **DISMISSED with prejudice**.[2]

Because reasonable jurists would not find this decision to be debatable or incorrect, IT IS FURTHER ORDERED that a **certificate of appealability is DENIED**. The Clerk of Court is directed to **enter judgment, in favor of respondents and against Deloney, dismissing this action with prejudice**.

DATED August 30, 2017.

_____
Robert C. Jones
United States District Judge

---

[2] A petitioner may not use a reply to an answer to present additional claims and allegations that are not included in the federal petition. *See, e.g., Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). To the extent that Deloney has done so in his federal reply, this Court does not consider these additional claims and allegations.